UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

LOST PENINSULA MARINA DEVELOPMENT          Case No. 07-62230
COMPANY, LLC, LOST PENINSULA MARINA,       Case No. 07-62333
LLC AND MAUMEE BAY SUPPLIES, LLC           Case No. 07-62336
                                           Chapter 11
                          Debtors.         Judge Marci B. McIvor
_____/

DAVID W. ALLARD, CHAPTER 11 TRUSTEE OF
LOST PENINSULA MARINA DEVELOPMENT
COMPANY, LLC, LOST PENINSULA MARINA,
LLC AND MAUMEE BAY SUPPLIES, LLC,

                          Plaintiff,

v.                                         Adv. No. 09-6788

DOUBLE D FIRE PROTECTION, INC., a Michigan
corporation, DESIGN ENGINEERS &
CONSULTING ASSOCIATES, INC., an Ohio
Corporation, COPPER CREEK DEVELOPMENT
CORP., a Michigan corporation, and MICHIGAN
WETLANDS DEVELOPMENT &
CONSTRUCTION, LLC, a Michigan limited liability
company.

                          Defendants,

and

WEST BEND MUTUAL INSURANCE COMPANY,
a Wisconsin Corporation,

                          Garnishee Defendant.

_____/


## OPINION GRANTING WEST BEND MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

On December 28, 2009, Plaintiff Trustee obtained a default judgment in the

amount of $2,558,058.65 against Double D Fire Protection, Inc. ("Double D"). On April

3, 2012, Plaintiff filed a garnishment action in this case against the West Bend Mutual

Insurance Company ("West Bend"), as the insurer of Double D. The garnishment action

sought to collect from West Bend the amounts owed on the default judgment. On

October 3, 2012, West Bend filed this Motion for Summary Judgment, seeking a finding

that it is not liable for payment of the default judgment obtained against Double D. For

the reasons set forth below, this Court grants summary judgment in favor of West Bend.


I.

FACTUAL BACKGROUND

In 1969, Toledo, Ohio and Monroe County, Michigan entered into an agreement

for the City of Toledo to supply water to designated portions of Monroe County,

including all of Erie Township, Michigan. (Complaint, ¶ 15). Under the Water

Agreement, the City of Toledo is obligated to sell and deliver water to Monroe County

in order to supply the consumers in Erie Township with adequate water service. *(Id.)*

Toledo is the exclusive source of water for Erie Township. *(Id.)* Monroe County cannot

construct an alternative water supply system, or in any manner aid or assist any others

in doing so, except as required by state law. (Complaint, ¶ 15).

Lost Peninsula Marina Development Company, LLC ("LPMDC") was the owner

of approximately 82 acres of real property located at 6300 Edgewater Drive, Erie

Township, Michigan, (the "Property"), which contains a facility known as the Lost

Peninsula Marina (the "Marina"). Mel Belovicz and Christopher Connolly (the "Owners")

were the sole members of LPMDC. (Complaint, ¶¶ 6, 9). The Marina Property was

purchased in 1994.  The Marina Property has been serviced by a water main reportedly constructed in or around 1911 that is only six inches in diameter. (Complaint, ¶ 17)

In the early part of this decade, LPMDC began work on a comprehensive development of the Marina Property, part of which included a two-story clubhouse (with an office, community space, kitchen, private baths and showers, laundry facilities), a swimming pool, hot tub, redesigned marina slips (with floating docks, water, electric, and TV pedestals), and infrastructure upgrades (including new entrance drive, renovated docks, extension of water lines to slips, and upgraded electrical service) (the "Redevelopment"). (Complaint, ¶ 18). The clubhouse was intended to serve as the centerpiece of this Redevelopment.  *(Id.)*

LPMDC  struggled with the limited flow of water for several years. (Complaint, ¶ 17).  However,  LPMDC thought that it might be possible to install and operate the Redevelopment improvements with the existing water supply system, despite the system's limitations. (Complaint, ¶ 18).  Around this time, LPMDC also began work on seeking approvals for a second, more extensive phase of the development, consisting of waterfront residential units for sale to private home builders. *(Id.)* These residential units would be dependent upon a proposed upgrade in water services. *(Id.)*

In or around early 2004, LPMDC filed a site plan and special land use application for the non-residential Redevelopment improvements.  (Complaint, ¶ 19). Erie Township approved the preliminary and final Redevelopment site plans and the special land use. (Complaint, ¶ 20). The Township then issued building permits for the improvements approved under the final Redevelopment site plan. *(Id.)*  Having

3

received approval and building permits from Erie Township, LPMDC began construction of the Redevelopment pursuant to the approved site plans. (Complaint, ¶ 21).

LPMDC entered into a contract with Michigan Wetlands Development & Construction LLC and Copper Creek Development Corporation to serve as the general contractors for the construction of the Redevelopment improvements, including the clubhouse. (Complaint, ¶¶ 22, 23). Mel Belovicz controlled both of these entities. (Complaint, ¶¶ 10, 11).

In the spring of 2006, the general contractor began accepting bids for the installation of the fire suppression system in the Marina clubhouse. (Complaint, ¶ 25). It received several bids from companies specializing in the installation of fire suppression systems. *(Id.)*

On April 13, 2006, Double D submitted a base bid of $35,900 to design and install a fire suppression system. (Complaint, ¶ 26). The fire protection plan submitted by Double D required a water supply flow of 950 gpm. (Complaint, ¶ 27). Double D's bid was selected and Double D entered into a contract with the general contractor to install the fire suppression system for the clubhouse. (Complaint, ¶ 28). Double D submitted a fire protection plan to Erie Township for approval by the Township's architect. (Complaint, ¶ 29). The architect reviewed the plan and other submissions from Double D and recommended that a permit be issued by the Township subject to tests and field inspections. *(Id.)* In particular, the Township architect stated that, with respect to the water supply flow of 950 gpm, "verify such test complies." *(Id.)* An Erie Township building official approved the fire protection plan. *(Id.)* Erie Township also

4

required that a design engineering firm approve the fire protection plan. Design Engineers & Consulting Associates, Inc. ("DECA") reviewed and approved Double D's fire protection plan. (Complaint, ¶ 35). DECA also provided design work for the fire suppression plans submitted by Double D. (Complaint, ¶ 36). After obtaining the requisite approvals, Double D installed the fire suppression system in the clubhouse. (Complaint, ¶ 38). Construction of the clubhouse was substantially completed in 2007. (Complaint, ¶ 24). After Double D completed the installation of the fire suppression system, LPMDC discovered that the fire suppression system did not conform to code specifications and requirements because the actual water pressure and flow levels on Edgewater Drive were not sufficient to support the fire suppression system. (Complaint, ¶ 39). Pressure and flow tests later performed by the City of Toledo, at Plaintiff's request, indicate that the water supply on Edgewater Drive was only half of that noted on Double D's Fire Protection Plan, or 493 gpm at a residual pressure of 10 psi. (Complaint, ¶ 30). City of Toledo records indicate that the pressure and flow at this location has been roughly the same over the past 15 years. *Id.* Erie Township refused to issue LPMDC a permanent Certificate of Occupancy for the clubhouse because the fire suppression system did not conform to code specifications and requirements due to the insufficient water pressure and flow in the water main servicing the Marina. (Complaint, ¶ 41).

LPMDC sued Erie Township in June 2007. (Complaint, ¶ 42). In response to the lawsuit, the Township issued a Temporary Certificate of Occupancy, which significantly limited the use of the clubhouse. (*Id.*) The Township prohibited all use of the second floor, with the exception of the outside deck area. (*Id.*)

5

An adequate fire suppression system could not be designed or installed for the clubhouse given the inadequacy of the water supply. (Complaint, ¶ 43). Plaintiff Trustee ultimately spent in excess of $10,000 to hire another party to redesign the fire suppression system to provide protection for a downsized clubhouse. (Complaint, ¶ 40).

On November 27, 2007, LPMDC filed for chapter 11 for bankruptcy.

On October 30, 2009, Plaintiff Trustee filed this adversary proceeding, naming Double D, among others, as a defendant. The Complaint alleges three causes of action against Double D: negligence, breach of contract, and negligent misrepresentation. The negligence claim against Double D is predicated on Double D's: (a) falsely assuming adequate water pressure to support its fire suppression system; (b) failing to request that the City of Toledo conduct a pressure and flow test; and (c) failing to design and install the fire suppression system in conformance with Code. (Complaint, ¶ 47). The breach of contract claim alleges that Double D's failure to properly design and install the fire suppression system was a breach of its contract with LPMDC. (Complaint, ¶ 60). The negligent misrepresentation claim is based on Plaintiff's allegation that Double D made negligent misrepresentations by representing that the water supply at the property was sufficient to install the fire suppression system as designed. (Complaint, ¶ 64).

On December 3, 2009, Plaintiff requested that the Clerk enter a default against Double D for its failure to answer the adversary complaint. On December 8, 2009, the Clerk entered a default against Double D. On December 23, 2009, Plaintiff moved for a default judgment against Double D, seeking $2,558,058.65 in damages. On

6

December 28, 2009, the Court granted Plaintiff's motion for a default judgment and entered a $2,558,058.65 default judgment against Double D. The judgment was entered without a hearing on the damages awarded.

Plaintiff also moved for default judgment against Copper Creek Development Corp., submitting the same documentation it submitted in support of its motion for default judgment against Double D and seeking the same $2,558,058.65 judgment. A default judgment was entered against Copper Creek on March 13, 2012.

At some point, Plaintiff became aware that Double D potentially had insurance coverage through West Bend Mutual Insurance Company.

On April 3, 2012, Plaintiff issued a request and writ for garnishment on West Bend.[1] The writ of garnishment was received by West Bend on April 16, 2012. The writ sought to garnish any funds owed by West Bend to Double D in satisfaction of Plaintiff's $2,558,058.65 default judgment against Double D, plus $188,978.44 in interest and costs – for a total of $2,747,046.09.

On April 5, 2012, Plaintiff filed a separate adversary proceeding against West Bend. (Adv. Proc. No. 12-4588). This adversary proceeding was dismissed for failure to effectuate proper service.

On April 18, 2012, West Bend filed its garnishee disclosure. In the garnishee disclosure, in the section on non-periodic garnishments, West Bend checked the box next to the statement that the garnishee "is not indebted to defendant for any amount

---

[1] The writ of garnishment was issued in the instant adversary proceeding. West Bend was added as a party in this litigation only after the writ of garnishment was issued.

and does not possess or control defendant's property, money, etc." for the reason that "WBMI is insurer for DD Fire Protection (cancelled policy)". In the section on periodic garnishments, West Bend checked the box next to the statement that the garnishee, "is not obligated to make periodic payments to the defendant during the 91 day period" because "WBMI was insurer for DD. No longer insure this company." Plaintiff did not contest these statements and took no action to challenge West Bend's denial of liability.

On May 17, 2012, Plaintiff filed another adversary proceeding against West Bend. (Adv. Proc. No. 12-4927). Adversary Proceeding No. 12-4927 seeks a declaratory judgment that West Bend has a duty to indemnify Double D for the default judgment.

On June 18, 2012, West Bend filed a Motion to Dismiss Adversary Proceeding No.12-4927, arguing that the case should be dismissed because there was a prior pending action, that being the garnishment action.

On July 31, 2012, this Court stayed Adversary Proceeding No.12-4927 and ruled that the parties should resolve the issue of West Bend's liability in the context of the garnishment filed in Adversary Proceeding No. 09-6788.

On October 3, 2012, West Bend filed a Motion for Summary Judgment in this case, alleging that the case against it should be dismissed on both procedural grounds and substantive grounds. Specifically, West Bend argues that: (1) Plaintiff failed to timely contest West Bend's denial of coverage for Double D and, therefore, West Bend is deemed to have no liability in this case; (2) even if this Court found that Plaintiff had the right to file a declaratory judgment action to determine the scope of Double D's

8

insurance policy coverage, West Bend had no duty to defend or indemnify Double D for the claims asserted in the underlying action because there was no "property damage" caused by an "occurrence"; and (3) even if there were an initial grant of coverage, numerous exclusions in the Policy exclude coverage.

## II.

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056 (Rule 56 applies in adversary proceedings).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. 317, 323.  Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a

9

"scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252. The court must

believe the non-movant's evidence and draw "all justifiable inferences" in the non-

movant's favor. *Liberty Lobby*, 477 U.S. at 255.


III.

JURISDICTION

Bankruptcy courts have jurisdiction over all cases under title 11 and all core

proceedings arising under title 11, or arising in a case under title 11. 28 U.S.C. §§

1334 & 157. Core proceedings include orders to turn over property of the estate. *Id.* §

157(b)(2)(E). As this is a proceeding to determine property of the estate, this is a core

proceeding under 28 U.S.C. § 157(b). Thus, this Court has jurisdiction over this

matter.


IV.

ANALYSIS

**A. Under Michigan Garnishment Law, this Court Is Obligated to Accept West Bend's Statement of Non-liability as True.**

Garnishments in federal court are handled "in accord with the procedure of the

state where the court is located." *International Assoc. of Machinists and Aerospace*

*Workers v. Michigan Gage Specialists, Inc.*, 2008 WL 5235917 *1 (E.D. Mich. Dec. 15,

2008) (*citing* Fed. R. Civ. P. 69(a)(1)) (Ex. 6b). Garnishment actions in Michigan are

governed by Michigan Court Rule. *See* MCR 3.101. The writ of garnishment serves

as the complaint, while the garnishee disclosure serves as the answer. *Id.* (*citing* MCR

10

3.101(M)(1), (2)).  Summary judgment is appropriate in a garnishment proceeding.  *Id.*

(*citing* MCR 3.101(M)(5)).

In determining a garnishee's liability, MCR 3.101(M)(2) provides that "[t]he facts

stated in the disclosure *must be accepted as true* unless the plaintiff has served

interrogatories or noticed a deposition within the time allowed under subrule (L)(1) or

another party has filed a pleading or motion denying the accuracy of the disclosure"

(emphasis added).  Except as admitted, the verified statement in the disclosure is

deemed denied.  *Id.*  MCR 3.101(L)(1) permits the plaintiff to serve the garnishee with

written interrogatories or a notice of deposition within 14 days after garnishee's service

of its disclosure.  Where the party seeking garnishment fails to serve interrogatories or

a notice of deposition within the requisite time period, a court must accept the facts

stated in the garnishee's disclosure as true.  *Alyas v. Illinois Employers Ins. of Wausau*,

527 N.W.2d 548, 550-551 (Mich. Ct. App. 1995).

In *Alyas*, the plaintiff obtained a consent judgment against an insured tortfeasor,

and then served a writ of garnishment against the tortfeasor's insurer seeking to satisfy

its judgment from an insurance policy.  *Id.* at 550.  The garnishee insurer filed a

disclosure that denied liability.  *Id.* The plaintiff failed to serve interrogatories or a

deposition notice within 14 days, and the trial court granted summary disposition in

favor of the insurer.  *Id.*  Addressing this issue, the Michigan Court of Appeals held:

> We agree with defendant that summary disposition was
> properly granted.  MCR 3.101(M)(2) provides that facts
> stated in a garnishment disclosure must be accepted as
> true unless the plaintiff has served interrogatories or a
> notice of deposition within the time allowed by subrule
> [(L)(1)] or another party has filed a pleading or motion
> denying the accuracy of the disclosure.  Under MCR

11

> 3.101[(L)(1)], a plaintiff has fourteen days after service of
> the garnishee disclosure to serve the garnishee defendant
> with written interrogatories or notice of deposition.  It is
> undisputed that in the case at bar plaintiff failed to do so
> within fourteen days.  Accordingly, under subrule (M)(2), the
> trial court was required to accept as true the facts stated in
> Wausau's garnishment disclosure.  That disclosure stated
> that there was no liability inasmuch as no monies were
> owed under any policy of insurance by Wausau to the
> principal defendant.  Because that fact must be accepted as
> true, summary disposition in favor of Wausau was
> appropriate.

*Id.* at 550.  Moreover, the court rejected plaintiff's arguments that: (a) the insurer had

suffered no prejudice, noting that the rule does not contain a prejudice requirement;

and (b) that the court had discretion under MCR 3.101(T) to extend the time for

discovery, noting that plaintiff had failed to seek the extension.  *Id.* at 328.

This holding is now well-established Michigan law.  *See, e.g., Harten v. French,*

2003 WL 1878771 (Mich. Ct. App.)(garnishee insurer's statement that coverage was

excluded under policy must be taken as true where garnishor failed to serve timely

discovery); *Jonesville Development Co. v. K&K Galleries, Inc.,* 2001 WL 865098 (Mich.

Ct. App.) (statement that money garnishee possessed was not owed to defendant must

be taken as true where no discovery served).

In *Lee v. CNA Ins. Co.,* 2005 WL 2400924 *1 (Mi. Ct. App.), the plaintiff

obtained a default judgment and served a writ of garnishment on defendant's insurer.

The garnishee insurer served a disclosure denying any indebtedness, and simply

stated that the "[p]olicy does not apply to underlying claim and policy defenses and

exclusions apply."  *Id.*  The plaintiff did not serve interrogatories or a notice of

deposition within 14 days, but instead filed a declaratory judgment action seeking the

proceeds of the insurance policy.  *Id.*  The trial court granted the garnishee insurer's

motion for summary disposition, stating that it would not address the issue of policy coverage other than to say that the plaintiff was "stuck with" the defendant's denial because it had failed to contest the disclosure. *Id.* The plaintiff then served a second writ of garnishment, and the trial court granted the insurer's motion to quash the writ, concluding that the facts taken as true cannot be questioned in the second garnishment attempt. *Id.* The Michigan Court of Appeals again addressed the issue of the plaintiff's failure to serve timely discovery, and held that under MCR 3.101(L)(1) and *Alyas*, the plaintiff was precluded from challenging the insurer's statement of non-liability. *Id.* at *2. The court also held that under *Alyas,* an insurer's statement of non-liability was a statement of fact, not law, and that the admitted statement of non-liability was controlling in any subsequent action. *Id.* at *2-3.

Lastly, federal case law has relied on *Alyas* to analyze the priority of claims against a defendant's assets. In *Local 58, Intern. Broth. of Elec. Workers, AFL-CIO v. G.T. Einstein Electric, Inc.*, 932 F. Supp. 974 (E.D. Mich. 1996), the United States District Court for the Eastern District of Michigan addressed whether two writs of garnishment had priority over a tax lien. *Id.* at 977. The court first looked to whether the writs were effective, and noted that the garnishee had responded to both writs by denying that a debt was owed. *Id.* The court then quoted MCR 3.101(L)(1), cited to *Alyas*, and held that:

> The docket reflects that Local 58 failed to serve interrogatories or notices of deposition within 14 days of the disclosures filed by Elkin. Further, no other parties contested the accuracy of Elkin's disclosures within 14 days. Therefore, under M.C.R. 3.101(M)(2) and *Alyas*, this court must accept as true Elkin's statements that, at the time of the filing of the writs, Elkin owed no money to

13

Einstein.  Local 58's writs against Elkin were not effective.

*Id.* at 978.

In the present case, West Bend denied liability in its garnishee disclosure stating that it  "is not indebted to defendant for any amount and does not possess or control defendant's property, money, etc."  and that it "is not obligated to make periodic payments to the defendant during the 91 day period".  Plaintiff was served with the garnishee disclosure and did not take issue with this denial of indebtedness.  Plaintiff did not serve written interrogatories or deposition notices at any time.  Defendant argues that, in accordance with MCR 3.101(M)(2) and multiple Michigan state and federal court cases, this Court is obligated to accept West Bend's statement of non-liability as true. Defendant requests that this Court grant West Bend's motion for summary judgment, and dismiss  Plaintiff's garnishment action with prejudice and on the merits.

Plaintiff makes three arguments as to why West Bend should be required to defend the issue of insurance coverage on the merits, notwithstanding Plaintiff's failure to comply with MCR 3.101.  First, Plaintiff argues that the garnishee disclosure did not address the issue of coverage under the policy; instead, the garnishee disclosure merely stated that the policy was no longer in effect.  The garnishee disclosure stated as its reasons for not being indebted to Double D as "WBMI is insurer for DD Fire Protection (cancelled policy)" and "WBMI was insurer for DD.  No longer insures this company."  The Trustee claims that it could have, in theory, challenged this factual assertion (whether the policy was cancelled at the time of the garnishment) under MCR 3.101 but that the issue of whether the policy was cancelled at the time of the

14

garnishment is immaterial. Plaintiff argues that because the issue of whether the policy was in effect at the time of the garnishment is not relevant (everyone agrees that the policy was not in effect *at the time of the garnishment*), Plaintiff had no cause to contest the garnishee disclosure.

This Court rejects Plaintiff's argument. A plain reading of the garnishee disclosure shows that West Bend is denying coverage of ANY liability for acts caused by Double D. The garnishee disclosure states that West Bend "is not indebted to defendant for any amount and does not possess or control defendant's property, money, etc." and that West Bend, "is not obligated to make periodic payments to the defendant during the 91 day period". Under the Michigan Court Rules, Plaintiff was obligated to challenge the assertion of non-liability within 14 days; if Plaintiff fails to do so, the insurer's statements on the garnishee disclosure form are accepted as true. As the court stated in *Alyas* in response to the same argument asserted by the Plaintiff in this case:

> Next, plaintiff argues that defendant's disclosure was deficient because it failed to disclose that it was an excess carrier or how much coverage was provided and, instead, simply stated that there was no liability. This argument, however, is relevant to the accuracy of the garnishee disclosure, and the accuracy of the disclosure is precisely what plaintiff is now precluded from arguing in light of plaintiff's failure to challenge the disclosure's statement of nonliability within the period required under subrule M(2).

*Aylas*, 527 N.W.2d at 551. In this case, because Plaintiff did not comply with MCR 3.101(M)(2), this Court is obligated to accept West Bend's statement that it is not indebted to Double D as true. Since West Bend's is not indebted to Double D, West Bend cannot be required to indemnify Double D for any loss Double D's acts caused to

15

LPMDC.

Plaintiff's next argument is that the federal courts have discretion in applying state garnishment procedures. Plaintiff argues that, while this Court should defer to Michigan procedural rules for garnishment procedures, it cannot allow those procedural rules to affect the parties' substantive rights in a manner inconsistent with the federal rules. Plaintiff argues that this case should proceed as if the two parties had filed a complaint under Fed. R. Civ. P.7(a) and an answer under 7(a) – in which case there is no requirement for Plaintiff to affirmatively dispute West Bend's answer. Accordingly, Plaintiff argues that, because this is a federal court, the failure to object to the garnishee disclosure has no effect on Plaintiff's ability to litigate the merits of whether West Bend is obligated to indemnify Plaintiff for any damage caused by Double D.

Plaintiff cites *PNC Securities Corp. v. Finanz-Und GMBH Liedgens*, 101 F.3d 702 (Table); No. 95-5258, 1996 WL 665574 (6th Cir. 1996) in support of its position that federal law, not state garnishment law, applies in federal courts. The issue in *PNC Securities* was whether a garnishment which did not comply with the jurat requirement of Kentucky law was invalid if the writ was amended after a response had been filed. The *PNC Securities* case does not address the consequences of a failure to challenge factual allegations in a garnishee disclosure within the time frame established by state law. Thus, this Court finds that the *PNC Securities* case has no applicability to this case.

As noted above, garnishments in federal court are handled in accordance with the procedures of the state where the court is located. *Local 58, Intern. Broth. of Elec. Workers, AFL-CIO v. G.T. Einstein Electric, Inc.*, 932 F.Supp. 974 (E.D.Mi. 1996);

16

*International Assoc of Machinist and Aerospace Workers, supra,* 2008 WL 5235917.

Since Plaintiff's garnishment was filed in the United States Bankruptcy Court in the

Eastern District of Michigan, Michigan law controls this matter.

Lastly, Plaintiff argues that his failure to follow the garnishment procedures

required by Michigan law does not preclude him from pursuing a separate declaratory

judgment action against the insurance carrier in a separate case. While this argument

might more properly belong in a response to the Motion to Dismiss filed by West Bend

in the declaratory judgement action already filed by the Plaintiff (Adv. Proc. No. 12-

4927), the Court understands that an adverse ruling in this Adversary Proceeding could

effectively preclude Plaintiff from pursuing its declaratory judgment action as a

separate matter. Therefore, this Court will address the issue of whether Plaintiff's

failure to comply with the relevant state garnishment statutes preclude Plaintiff from

bringing a subsequent declaratory judgment action to litigate the scope of West Bend's

insurance coverage.

Plaintiff cites *Ounan v. Hastings Mutual Insurance Co.*, 1996 WL 33347940

(Mich. Ct. App.); *Anderson v. Kemper Insurance Co.*, 340 N.W.2d 87 (Mich. Ct. App.

1983); *Muxiow Auto Club Ins. Ass'n*, 394 N.W.2d 121, 122 (Mich. Ct. App. 1986) in

support of his argument that the failure to comply with state garnishment procedures

does not preclude him from the litigating the merits of Double D's insurance coverage

in a separate declaratory judgment action.

This Court finds that none of the case law cited by Plaintiff supports his

argument. In *Ounan,*1996 WL 33347940, one of the issues was whether a judgment

creditor who had a right to bring a garnishment action could, instead, bring a declaratory judgment action against the party that would have been the garnishee defendant.  The Court determined that the plaintiff could proceed either by a garnishment or a declaratory judgment action.  *Id*.  The case never addresses whether a declaratory judgment action could have proceeded had Plaintiff already attempted a garnishment which had proven unsuccessful.

In *Anderson v. Kemper*, 340 N.W.2d at 87 and in *Muxlow,* 394 N.W.2d at 122, the statement of facts indicate that there was a garnishment action at some time prior to the filing of the declaratory judgment action.  In both cases, the Court of Appeals ruled on an appeal from a ruling in the declaratory judgment action without opining on the issue of whether the prior  "unsuccessful garnishment attempt" should have prevented the plaintiffs from filing the declaratory judgment action because that issue had never been raised by any party.

This court has found no case law explicitly holding that a plaintiff's failure to comply with state law garnishment procedures precludes that plaintiff from bringing a subsequent declaratory judgment action to litigate an insurance coverage issue which can no longer be litigated in the garnishment action.  However, there is a doctrine known as the "prior pending action doctrine", by which a court may avoid duplicative litigation.  Under the "prior pending action doctrine", parties are prohibited from litigating claims more than once.  *Lexico Enter., Inc. v. Cumberland Farms, Inc.*, 688 F. Supp.2d 221, 224 (E.D. Mich. 2010)(*citing Colorado River Water Conservation Dist. V. United States*, 424 U.S. 800, 817 (1976)).  Under this doctrine, a court will dismiss a subsequent suit that duplicates a claim or claims already pending in court.  *Id.*  One of

18

the tests to determine whether a suit is duplicative of a prior-filed suit is whether:

> The courts quite uniformly agree that parties may not be harassed by new suits brought by the same plaintiff involving the same questions as those in pending litigation. If this were not so repeated suits involving useless expenditures of money and energy could be daily launched by a litigious plaintiff involving one and the same matter. Courts will not lend their aid to proceedings of such a character, and the holdings are quite uniform on this subject.

*Id. (quoting Chapple v. National Hardwood Co.*, 207 N.W. 888, 350 (Mich. 1926).

Moreover, Michigan has codified this doctrine in its court rules. MCR 2.116(C)(6) provides for a court to summarily dismiss an action based on the grounds that "[a]nother action has been initiated between the same parties involving the same claim." *See, Valeo Switches and Detection Systems, Inc. V. Emcom, Inc.*, 725 N.W.2d 364 (Mich. Ct. App. 2006)(quoting MCR 2.116(C)(6)); *Darin v. Haven*, 437 N.W.2d 349 (Mich Ct. App. 1989).

In this case, Plaintiff initiated garnishment proceedings against West Bend on April 3, 2012. Plaintiff had the opportunity to litigate the merits of whether West Bend was required to indemnify Double D for damage caused to Plaintiff in the garnishment proceeding. Plaintiff failed to do so. On May 17, 2012, Plaintiff filed a declaratory judgment action on the same issue set forth in the garnishment action, that being whether West Bend had any liability to Double D. Because Plaintiff filed a separate declaratory judgment action while its garnishment action was still pending in this adversary proceeding, the "prior pending action doctrine" requires the dismissal of Plaintiff's declaratory judgment action. The declaratory judgment action cannot be used to circumvent Plaintiff's failure to comply with the requirements of Michigan

19

garnishment law.[2]

In conclusion, this Court finds that Plaintiff's failure to comply with Michigan

garnishment rules precludes Plaintiff from litigating the merits of West Bend's insurance

coverage by way of a separate declaratory judgment action. Pursuant to MCR

3.101(M)(2), the facts stated in West Bend's disclosure must be accepted as true

because Plaintiff failed to serve interrogatories or a notice of deposition within fourteen

days after the filing of the disclosure. West Bend has asserted it owes nothing to

Double D. Since West Bend has no obligation to Double D, West Bend is entitled to

Summary Judgment on the garnishment action.


**B.      Double D's Failure to Verify the Water Pressure Prior to Installation of the
          Fire Suppression System Is Not  an "Occurrence" as Defined by its
          Insurance Policy with West Bend.**

Even if this Court held that Plaintiff could litigate the scope of Double D's

insurance policy coverage by way of a separate declaratory judgment action, this Court

finds that the act committed by Double D which caused damage to LPMDC is not an

"occurrence" which would trigger insurance coverage by West Bend. The Commercial

General Liability Coverage policy (the CGL coverage) limits insurance coverage to an

---

[2]While the prior pending action doctrine played no part in the *Alyas* or *Lee* cases,
this Court notes that implicit in those decisions was a ruling that the Plaintiff was forever
barred from further litigation against the garnishee defendant. *See, Aylas*, 527 N.W.2d
at 551 (garnishor's failure to challenge garnishee disclosure statement with proscribed
time precluded garnishor from challenging the garnishee disclosure); *Lee*, 2005 WL
865098 *3 (the court found that the statement of non-liability controlled the outcome of
the case and the action was dismissed with prejudice).

"occurrence". The CGL coverage policy contains the following language:

SECTION I – COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.      Insuring Agreement

      a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

. . .

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

      b.    **This insurance applies to "bodily injury" and "property damage" only if:**

        **(1)**    **The . . . "property damage" is caused by an "occurrence"** that takes place in the "coverage territory";

        (2)    The . . . "property damage" occurs during the policy period[.]

(CGL Coverage Form, pp. 1-2 (emphasis added))

Coverage thus requires an "occurrence." Only if "property damage" is caused by

an "occurrence" will there be the potential for coverage under the Policy.  "Occurrence"

is defined in the Policy as an accident:

SECTION V – DEFINITIONS

21

*   *   *

13.    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(CGL Coverage Form, p. 15 (bold in original)).

In considering the merits of Plaintiff's declaratory judgment action, the court must answer several questions.  First, what did Double D do that caused damage to LPMDC?  Second, what was the scope of that damage?  Third, was the act that caused the damage an "occurrence" under Double D's insurance policy with West Bend?

To answer the first question, the Court turns to the Complaint filed by Plaintiff Trustee in the instant adversary proceeding.  Plaintiff states that Double D's fire suppression plan required  a water supply flow of 950 gpm. A flow of that magnitude was required because of the size of the clubhouse. Plaintiff also states that the Erie Township architect recommended that a permit be issued to Double D with the caveat that Double D test the water supply to "verify such test complies".  Because the actual flow was only 493 gpm (Complaint, ¶30), Double D either did not test the water flow, or did test the flow and proceeded anyway. In either case, when the fire suppression system was completed, the clubhouse could not satisfy the Township building code because there was insufficient water pressure to make the fire suppression system effective in a building of that size.  The act that caused damage to LPMDC was Double D's failure to test the flow prior to starting the installation of the fire suppression system.  Had Double D conducted such a test, they presumably would have withdrawn or revised their bid, because Double D would have been aware that "an adequate fire

22

suppression system could not be designed or installed for the clubhouse given the inadequacy of the water supply."  (Complaint, ¶ 43).

The second question which this court must answer is what damage did LPMDC suffer as a result of Double D's failure to confirm that there was sufficient water pressure to provide  water for a fire suppression system for the entire clubhouse? The only direct damage suffered by LPMDC was the payment of $35,900 for a fire suppression system that Double D should have known was doomed to failure. Once LPMDC realized that no company could install a fire suppression system that would be effective for the entire clubhouse because of the constraints of the water pressure, LPMDC incurred approximately $10,000 in additional costs to pay another company to install a system that could work in the smaller space for which Erie Township had granted a temporary certificate of occupancy.  This court concludes, based on Plaintiff's complaint, that LPMDC suffered total damages in the neighborhood of $46,000 as a result of Double D's failure to test the water pressure prior to installing a fire suppression system.

The third question which must be answered by this court is whether the act that caused the damage is an occurrence under the insurance policy Double D held with West Bend.  Based on the facts stated by the Plaintiff, the court first finds that Double D's failure to test the water flow constitutes faulty workmanship on the part of Double D.  Double D's own plans required a certain level of water pressure to provide an effective  system for the entire clubhouse. Double D should have known (by conducting tests) that there was insufficient water pressure to install such a system. The failure to do so constitutes defective workmanship on the part of Double D.

23

Under Michigan law, defective workmanship is not an "occurrence" within the meaning of Commercial General Liability Coverage. Generally courts hold that if the circumstance that caused the damage (the defective workmanship) was within the control of the insured, the insurer cannot be held liable for the defective workmanship. *See, Hawkeye Security Ins*, 460 N.W.2d 329, 334 (Mich. Ct. App. 1990); *see also*; *Kent Companies, Inc. v. Wausau Ins. Cos*. (Docket No. 295237), 2011 WL 1687676 (Mi. Ct. App.)(insured poured a concrete slab that did not have "weep holes," necessitating its replacement, and the court determined that the "plaintiff's defective workmanship does not involve an 'occurrence'"); *Ahrens Construction, Inc. v. Amerisure Ins. Co.*, 2010 WL 446543 (Mi. Ct. App.)(allegations that subcontractor defectively built roof not an "occurrence"); *Hometowne Bldg Co, LLC v. American Mut. Ins. Co.*, 2009 WL 3276509 (Mi. Ct. App.) (water damage to building due to general contractor's faulty construction was not an "occurrence"); *Hastings Mut. Ins. Co. v. Mosher, Dolan, Cataldo & Kelly, Inc.,* 2006 WL 1360404 (Mi . Ct. App.) *lv. den.* 480 Mich. 928 (2007) (damage to home caused by numerous defects during construction was not an "occurrence" as the house was the insureds' work).

The facts of *Hawkeye* are analogous to the facts of the instant case. In *Hawkeye*, Vector, a concrete contractor contracted with the general contractor to pour the concrete for a waste water treatment plant. Vector then contracted with Boichot Concrete Company to provide Vector with concrete meeting certain project specifications. After the concrete was poured, testing revealed that the concrete failed to comply with project specifications. Vector removed and repoured 13,000 yards of

concrete. Vector subsequently sought to recover the cost of repouring the concrete from its insurance carrier, Hawkeye Security Insurance Company. The Michigan Court of Appeals affirmed the trial court's order granting summary judgment to Hawkeye, finding that the damages for which Vector sought recovery from the insurance company, were the result of defective workmanship and, therefore, not recoverable from the insurer, Hawkeye Security Insurance Company. The court stated, "[w]e hold that the defective workmanship of Vector, standing alone, was not the result of an occurrence within the meaning of the insurance contract. Summary disposition was properly granted on this issue." (Hawkeye at p378)

In the instant case, the acts that caused injury to LPMDC were: 1) Double D's failure to perform the tests that would have confirmed that there was insufficient water pressure, and 2) accepting money for a contract Double D knew, or should have known, that it could not complete. Those acts were within the control of Double D, and therefore not an "occurrence" as defined by the insurance policy.

Plaintiff does not dispute that Double D's failure to perform the necessary tests was defective workmanship. However, Plaintiff argues that defective workmanship which results in damage to the property of others is an "accident" within the meaning of the standard comprehensive liability policy. See *Radenbaugh v. Farm Bureau Gen. Ins. Co. of Mich.*, 610 N.W.2d 272, 279-280 (Mich. Ct. App. 2000) *Hastings Mut. Ins. Co. V. Mosher, Dolan, Cataldo & Kelly, Inc.*, 2006 WL 1360404 (Mich. Ct. App.). Plaintiff argues that Double D's defective workmanship did not extend solely to the installation of the fire suppression system, but rather, caused damage to the Marina as

a whole because the "Marina lost the complete use of the Clubhouse because of Double D's failures." (Plaintiff's brief at p. 14)

Plaintiff's argument, and the case law cited to support that argument, completely ignore the actual facts of this case. Plaintiff concedes it its complaint that "[a]n adequate fire suppression system could not be designed or installed for the clubhouse given the inadequacy of the water supply. Any effort to do so would have been far more expensive than the plan pursued by Double D, and even then it would have been unlikely to work." (Plaintiff's Complaint, paragraph 43) Thus by Plaintiff's own admission, LPMDC lost the use of the clubhouse because of the inadequacy of the water supply, not because Double D failed to conduct tests to **prove** that the water supply was inadequate. Looking at this case with the benefit of hindsight, it appears that the entire redevelopment project was predicated on a faulty premise, that premise being that notwithstanding the limited water supply ( a fact known to LPMDC long before it entered into a contract with Double D), there was sufficient water for a large clubhouse and the many other improvements LPMDC made to the property.[3] Double D's role in LPMDC's slide into bankruptcy is relatively small. As noted above, the damage suffered by LPMDC as a result of Double D's failure to test the water supply was that LPMDC had to pay $35,900 for a system that could not work and pay additional funds to install a system that could service a much smaller area. LPMDC filed for bankruptcy because it was unable to service its loans to its secured lender,

---

[3] This Court notes that every party involved in this case seems to have operated on the same mistaken premise. Both Erie Township and an engineering firm, Design Engineering & Consulting Associates, Inc. approved LPMDC's redevelopment plans.

26

Key Bank National Association. (See Motion to Dismiss Case for Cause Under § 1112, Docket No. 37 filed in 07-62330). Certainly, the lack of a functioning clubhouse may have contributed to LPMDC's inability to service its debt, but the lack of a functioning clubhouse was due to miscalculations made by LPMDC, Erie Township, Design Engineers & Consulting Associates, Inc. and Copper Creek Development Corp. about the problems an inadequate water supply would create for the entire redevelopment project. The court concludes that Double D's defective workmanship did not cause the type of ongoing, continuous harm to the property of others, that would require West Bend to indemnify Plaintiff for the damage caused by Double D.

The cases relied upon by Plaintiff have no applicability to the facts of this case. In *Radenbaugh,* the Radenbaughs sold a double-wide mobile home to the Tornows. In conjunction with the sale of the mobile home, Radenbaugh provided erroneous schematics and instructions to contractors hired by the Tornows for construction of their home's basement. It was later alleged and proven at trial that Radenbaughs' conduct caused damage to the home and its basement. In response to the lawsuit filed by the Tornows against Radenbaugh, Farm Bureau Insurance refused to defend or indemnify Radenbaugh under a commercial general liability policy. The court found that Radenbaugh's defective instructions to basement contractors was an "occurrence" within the meaning of Radenbaugh's insurance policy because the damage caused by the erroneous instructions caused ongoing harm to the Tornows, and would cause such harm until the problem was remedied.

As fully explained above, it was not Double D's defective workmanship that

caused ongoing harm to LPMDC, it was the lack of an adequate water supply. If it was Double D's defective workmanship that caused the harm alleged by the Plaintiff, LPMDC could have hired another company to install an effective fire suppression system for the entire clubhouse. Such a remedy was unavailable because of the inadequate water supply. The *Radenbaugh* case is inapplicable to the facts of the instant case.

This Court also finds that Plaintiff's reliance on the *Hastings Mutual, supra,* case is misplaced. In *Hastings*, the court stated, "when an insured's defective workmanship results in damages to the property of others, an "accident" exists within the meaning of the standard comprehensive liability policy." *Id.* at *4. The court also stated that an accident includes "continuous or repeated exposure to substantially the same general harmful conditions.." Double D's failure to test the water pressure prior to installing the fire suppression system was defective workmanship. However, it was not Double D's defective workmanship which prevented LPMDC from using the clubhouse. Nor did Double D's failure to test the water pressure cause a continuous or repeated exposure to the same general harmful conditions. Double D's failure to test the water pressure simply meant that LPMDC paid for the installation of a fire suppression system that should never have been installed.

In conclusion, this court finds that Double D's failure to test the water pressure prior to the installation of the fire suppression system is not an "occurrence" as defined by Double D's CGL Coverage policy. Therefore, West Bend is not required to indemnify Plaintiff for any damage caused by the acts of Double D.

**C.     Even If West Bend Was Required to Cover Damages Caused by Double D's Defective Workmanship, Insurance Coverage Would Only Extend to Damage Directly Caused by Double D's Failure to Check the Flow and Water Pressure Prior to Installing a Fire Suppression System.**

This Court has concluded that even if the Court were to permit the declaratory judgment action to go forward,  Double D's failure to install a fire suppression system that would pass building code requirements was not an "occurrence" covered by Double D's Commercial General Liability policy with West Bend.  However, even if West Bend did have an obligation to insure the type of loss caused by Double D's failure to install a fire suppression system that meets code requirements, West Bend's liability would be limited to the amount of harm directly caused by Double D's actions.

Preliminarily, it is important to remember that West Bend was not a defendant in the Plaintiff's litigation against Design Engineers & Consulting Associates, Inc., Double D Fire Protection, Copper Creek Development Corp. and Michigan Wetlands Development & Construction, LLC.  Double D failed to answer the complaint and on December 28, 2009, a Default Judgment was entered against Double D in the amount of $2,558,058.65.  Since West Bend was not a party to that litigation, this Court finds that even if West Bend had some obligation to insure Double D, the dollar amount which the Trustee could recover from West Bend as a result of that insurance coverage has never been litigated or determined.

The Court acknowledges that the amount of damages which would have been awarded to LPMDC had LPMDC sued Double D directly prior to filing for bankruptcy is purely speculative, and West Bend's liability would have been based on the specific

29

rulings made in that lawsuit. However, based on the pleadings filed in this action, and this court's conclusion as to the nature of the harm caused by Double D, the court is satisfied that West Bend's maximum liability in this case would be in the neighborhood of $50,000. As fully discussed above, Double D's liability stems from accepting payment for a contract that it could or should have known it could not perform. Double D accepted payment of $35,900 for a system that it should never have installed. In addition, once LPMDC became aware that the water supply made it impossible for ANY fire suppression system to work in a clubhouse as large as the LPMDC clubhouse, LPMDC was forced to spend additional funds to hire a company to design a system for the smaller space for which Erie Township had issued a Certificate of Temporary Occupancy. Had Double D initially advised LPMDC that the water pressure and flow were insufficient to provide enough water for an effective fire suppression system, LPMDC would have devised some other plan for the clubhouse, and might not have incurred these costs. It is impossible for this court to fathom how damages against Double D could exceed the contract amount paid to Double D, plus any amount necessary to install a system that could service the downsized clubhouse.

In conclusion, Double D's failure to independently verify the water pressure and flow constitutes defective workmanship which relieves West Bend of an obligation to cover Double D for any damages caused by Double D's failure. However, even if there is insurance coverage, West Bend's liability to Plaintiff would be limited to any amounts which could have been recovered directly from Double D for accepting payment of the bid amount on a contract which could not be successfully fulfilled.

30

V.

CONCLUSION

For the above stated reasons, this Court GRANTS summary judgment in favor of West Bend.  This Court will also enter an Order of Dismissal in Adversary Proceeding Case No. 12-4927.

Signed on January 17, 2013

                              /s/ Marci B. McIvor
                          Marci B. McIvor
                          United States Bankruptcy Judge